## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGEL ARCE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| U-PULL-IT AUTO PARTS, INC. | : | NO.  06-5593 |
| t/a CRESENT "U-PULL-IT" USED | : | |
| AUTO PARTS, JOSEPH MALLOZZI | : | |
| and JOSEPH A. MALLOZZI, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER S. J.                                          February 11, 2008

Currently pending before the Court is a Motion for Summary Judgment by Defendants U-

U-Pull-It Auto Parts, Inc., Joseph Mallozzi and Joseph A. Mallozzi.  For the following reasons,

the Court grants summary judgment in favor of Defendants and against Plaintiff.

## I.      FACTUAL HISTORY[1]

Defendant Cresent "U-Pull-It" Used Auto Parts ("U-Pull-It") is a junkyard located at 999

Bristol Pike, Morrisville, Pennsylvania, and owned and operated by U-Pull-It Auto Parts, Inc.

(Def. Mem. Supp. Summ. J. Ex. A; Mallozzi Dep. 27:1-30:19, Jul. 16, 2007.)  The sole

shareholder is Defendant Joseph Mallozzi, who is also the president of the corporation.  (Id. at

30:19-31:4.)  Defendant Joseph A. Mallozzi, Mr. Mallozzi's father, is the secretary and treasurer.

---

[1]  This summary was compiled from the briefs and exhibits submitted by both Plaintiff
and Defendants.  To the extent the parties have submitted conflicting evidence, the Court
considers such evidence in the light most favorable to Plaintiff, pursuant to Federal Rule of Civil
Procedure 56.

(<u>Id.</u> at 30:19-31:4.)

According to the junior Mr. Mallozzi, there are three different types of auto salvage yards. The first is a "you-pull-it operation," where the customer enters the yard and removes the desired parts himself.  (<u>Id.</u> at 24:21-24.)  Second, there are full-service operations where a customer orders a part over the counter, and the yard provides that part.  (<u>Id.</u> at 25:1-3.)  Finally, there are facilities that are operated as inventory stores, like Pep Boys, except that the parts are used.  (<u>Id.</u> at 25:3-5.)  Defendant U-Pull-It falls into the first of these three categories.  (<u>Id.</u> at 24:15-24.)

On July 10, 2006,[2] Plaintiff Angel Arce visited U-Pull-It for the first time with his cousin's husband, Jose Cintron, and an acquaintance of Mr. Cintron named Pedro Rosado.  (Arce Dep. 28:16-29:8, 30:4-17, June 28, 2007.)  At the time, Plaintiff was looking for a transmission to fit Mr. Cintron's Mazda Protégé.  (<u>Id.</u> at 29:10-18.)  Plaintiff brought with him the tools necessary to remove the transmission, but because Rosado told him that employees at the yard would lift up and secure the car, he did not bring either his jacks or jack stands.  (<u>Id.</u> at 36:8-37:8.)

Plaintiff testified that he had had a significant amount of experience working on cars and owned various mechanic equipment.  He worked at an automobile mechanic shop for nine months in Naples, Florida, during which time he was a full mechanic.  (<u>Id.</u> at 14:14-16:3.)  In addition, he attended one year of vocational school for auto mechanics and since then had worked on various cars owned by family, friends and neighbors.  (<u>Id.</u> at 25:3-26:9.)  Aside from his two hydraulic jacks, he also owned two jack stands that he used many times to support cars

---

[2]  Although Plaintiff testified that the date of his visit was July 11, 2006 (Arce Dep. 29:1-9), both parties agree that the visit was actually on July 10, 2006.

and pickup trucks.  (Id. at 39:5-21.)  Finally, he indicated that he had pulled out transmissions

three or four times at junkyards in both Puerto Rico and Camden, New Jersey.  (Id. at 43:19-

44:11.)

      Upon arrival at U-Pull-It, Plaintiff, Cintron and Rosado went to the front office.  (Id. at

48:22-24.)  Although there were a number of signs, Plaintiff could not read them since they were

in English and he could only read Spanish.[3]  (Id. at 49:1-8.)  He did not ask Rosado what they

said, even though Rosado could read English.  (Id. at 49:9-12.)  Rosado told his companions that

they had to pay two dollars per person to enter the junkyard and sign a sheet of paper "so that the

personnel at the junkyard would know how many people were entering the lot."  (Id. at 49:14-

20.)  Plaintiff testified that the sheet of paper had some writing on top, which he believed to be

only the name of the junkyard, as well as a column of signatures.  (Id. at 53:16-54:2.)  In

actuality, the paper stated as follows:

> WARNING: YOU ENTER THIS SITE AT YOUR OWN RISK
>
> BY SIGNING BELOW YOU GIVE UP ALL YOUR AND YOUR HEIRS
> RIGHTS AND CLAIMS TO ANY AND ALL INJURY OR PERSONAL
> TRAUMA OR INSULT.  YOU ALSO UNDERSTAND THAT THERE IS NO
> INSURANCE OR RECOURSE AVAILABLE IN THE EVENT OF ANY
> OCCURANCE [sic] OR ACCIDENT THAT HAPPENS DURING YOUR
> ARRIVAL ONTO THE PROPERTY OF U-PULL-IT AUTO PARTS, 999
> BRISTOL PIKE, MORRISVILLE, PA.  YOU AGREE TO HOLD HARMLESS
> U-PULL-IT AUTO PARTS, INC. AND ANY AND ALL PARTIES WITH
> INTEREST AT 999 BRISTOL PIKE, MORRISVILLE, PA.

(Def. Mem. Supp. Summ. J. Ex. A.)

      After Rosado spoke in English to the person working the counter, (id. at 54:4-17), the

---

[3]  Manual Rosado, Jr., an employee of U-Pull-It, testified that there was a sign that said
"Enter At Your Own Risk" in Spanish.  (Manual Rosado Dep., 33:7-23, Jul 25, 2007.)

three men signed the release and proceeded to enter the lot.  (Id. at 50:9-13; Def. Mem. Supp.

Summ. J. Ex. A.)  Plaintiff and Cintron began looking for a Mazda Protégé, while Rosado

searched for a part for his pickup. (Arce Dep., 58:14-23.)  Eventually, Plaintiff and Cintron

found a Protégé, which had no tires and sat flat on the ground.  (Id. at 59:1-23.)  Rosado rejoined

them and Cintron sent him to ask an employee of the junkyard, who was working the forklift, to

lift up the car.  (Id. at 59:15-18.)  When Rosado returned, however, he reported that the forklift

operator, Manual Rosado,[4] could not assist them.  (Id. at 60:1-8; Manual Rosado Dep. 14:13-

15:14, Jul. 25, 2007.)

Plaintiff thus proceeded to work on the car at the precise location in which he found it.

(Arce Dep. 60:11-13.)  The ground at that spot seemed solid.  (Id. at 60:14-15.)  As Plaintiff had

not brought his own car jacks, he and Cintron located two jacks inside other cars at the junkyard.

(Id. at 62:5-15, 63:10-13, 64:2-5.)  After raising the driver's side of the car with the first jack, he

placed the second jack on the car's manufacturer-designed jacking point in order to raise the

passenger side.  (Id. at 64:14-65:9.)  He also used a third jack, found in a large American car on

the lot, to hold up the front of the car.  (Id. at 75:23-77:8.)  Once the car was lifted, however, he

removed the third jack from the car.  (Id. at 78:11-16.)  Cintron assisted him with this process.

(Id. at 98:21-99:8.)

Plaintiff testified that he could have secured the car by putting three tires on each side and

that there were a sufficient number of those tires around the junkyard.  (Id. at 60:24-61:24, 65:13-

15, 68:15-19.)  He admitted, however, that he failed to follow the instructions of his shop teacher

by not having secured the car with either jack stands or tires before getting underneath to work on

---

[4] Notably, despite the shared last name, Pedro Rosado and Manual Rosado are not related.

it.  (Id. at 60:16-23.)  Although he explained that he needed bigger jacks in order to lift the car up high enough to slide two tires underneath, (id. at 70:23-71:9), the men never discussed returning home to get Plaintiff's jacks due to the extensive travel time.  (Id. at 71:10-72:7.)

In addition, Plaintiff knew that it was possible have U-Pull-It take the transmission out for an additional twenty-five to thirty-five dollars.  (Id. at 94:23-95:4; Cintron Dep., 15:9-16:8, June 28, 2007.)  Despite the fact that Cintron was willing to pay to have the junkyard perform this job had Plaintiff recommended it, (id. at 16:9-17:3), Plaintiff nonetheless opted to pull the transmission himself so that he could make more money.  (Arce Dep., 95:4-17.)

Ultimately, the men managed to raise the car ten to eleven inches off the ground.  (Id. at 75:9-20.)  Once Plaintiff had the two scissor jacks placed on each side, he removed the starter from the top, pulled out the axle from the wheel well on the side and proceeded to loosen up the bolts from the top.  (Id. at 79:2-5, 81:10-82:3.)  When one of the bolts would not budge, he slid underneath the car while it was sitting on only the jacks.  (Id. at 79:5-7, 85:20-22.)  He approached from the front of the car and turned completely on his chest with his hands in front of him.  (Id. at 84:7-20.)  As he began to exert strength on the ratchet, the car fell off the jacks.  (Id. at 84:20-85:2.)  Plaintiff was chest down to the ground, with his waist up to his head underneath the car.  (Id. at 99:24-100:8.)  He called for Cintron, who had gone to get him a soda, and then lost consciousness.  (Id. at 100:15-101:5.)  His woke up in the hospital two days later wearing a neck brace; he remained hospitalized for a total of six days.  (Id. at 103:11-104:6, 110:4-5.)

On December 22, 2006, Plaintiff initiated a negligence action against Defendant U-Pull-It Auto Parts, Inc., seeking compensatory and punitive damages.  Thereafter, on April 24, 2007, Plaintiff amended his Complaint to add Defendants Joseph Mallozzi and Joseph A. Mallozzi as

owners of the land on which U-Pull-It operates.  Defendants jointly filed a motion for summary judgment on September 14, 2007, asserting that judgment should be entered in their favor and against Plaintiff on the entirety of the Amended Complaint.

## II.   STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir.1993).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine

issue of material fact, it need not "support its motion with affidavits or other similar materials

negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548

(1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support

the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the

opposing party "must do more than simply show that there is some metaphysical doubt as to

material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a

jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or

not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp.,

32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh

Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## III.   DISCUSSION

### A.   Whether the Signed Release Precludes Liability

In their first argument, Defendants assert that the release signed by Plaintiff upon entry

into the junkyard precludes their liability. Plaintiff, in turn, asks the Court to disregard the

release as an unenforceable contract. Upon review of the prevailing jurisprudence, the Court

deems the release viable.

Pennsylvania law[5] will enforce an exculpatory clause if it meets several criteria:  (1) the

contract must not contravene any policy of law; (2) the contract must be an agreement between

individuals relating to their private affairs; (3) each party to the agreement must be a free

_____

[5]  The substantive law of Pennsylvania applies to this diversity case. Erie R. Co. v.
Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938).

bargaining agent, not one drawn into an adhesion contract with no recourse but to reject the whole transaction; and (4) the agreement must express the intent of the parties with the utmost particularity.  <u>Schiele v. Simpson Safety Equip., Inc.</u>, No. 91-CIV-1872, 1992 WL 73588, at *3 (E.D. Pa. Apr. 7, 1992); <u>Employers Liab. Assurance Corp. v. Greenville Bus. Men's Ass'n</u>, 224 A.2d 620, 622-23 (Pa. 1966).  The burden to establish immunity from liability rests upon the party who asserts such immunity.  <u>Id.</u>  Although such exclusionary clauses are not favored by the law and must be construed strictly against the party who seeks to avoid liability, a court "must use common sense in interpreting the agreement."  <u>Nicholson v. Mt. Airy Lodge, Inc.</u>, No. 97-CV-1296, 1997 WL 805185, at *3 (E.D. Pa. 1997) (quoting <u>Weiner v. Mt. Airy Lodge</u>, 719 F. Supp. 342, 345 (M.D. Pa. 1989).

In the case at bar, Plaintiff does not argue that the release is either contrary to public policy or not an agreement between individuals.  Rather, he contends only that (1) the contract was a product of adhesion and (2) the agreement did not express the parties' intentions with the utmost particularity.  The Court considers each assertion separately.

## 1.    <u>Whether the Contract Was One of Adhesion.</u>

In his initial argument, Plaintiff generally claims that the release was nothing more than a contract of adhesion, in which he was not a free bargaining agent and did not understand the terms of the disclaimer.  Specifically, he contends that the dictates of the Pennsylvania Supreme Court in <u>Beck-Hummel v. Ski Shawnee, Inc.</u>, 902 A.2d 1266 (Pa. 2006), compel a finding of invalidity.  Moreover, he claims that the release is unenforceable against him, in particular, because he could not read English.

In <u>Beck-Hummel</u>, plaintiffs, husband and wife, visited a ski resort with their children to

go snow tubing.  Id. at 1267.  Plaintiff husband purchased four tubing tickets for each member of

his family to use.  Id.  The tubing tickets contained, in part, the following language on the back:

> In consideration of using Ski Shawnee's facilities, the purchaser or user of this
> ticket agrees to accept the risks of skiing, snowboarding and snow tubing and
> agrees not to sue Ski Shawnee, Inc. or its employees if hurt while using the
> facilities regardless of any negligence of Ski Shawnee, Inc. or its employees or
> agents.

Id. at 1267-1268.  Neither husband nor wife read the exculpatory language typed on the ticket.

Id.  Nor did any employee of defendant verbally inform either plaintiff that, by paying for and

accepting the snow tubing ticket, they were entering into a contractual agreement with Ski

Shawnee, Inc., the terms of which included the exculpatory language on the snow tubing ticket.

Id. at 1267-68.  Plaintiffs had never gone tubing at Ski Shawnee prior to that date.  Id. at 1268.

While snow tubing, the plaintiff wife was injured and she brought a negligence claim against Ski

Shawnee.  Id. at 1268.  In the ensuing lawsuit, the trial court enforced the release and granted

summary judgment in favor of defendant.  Id. at 1268-69.

On appeal, the Pennsylvania Supreme Court noted that the issue was whether the release

was enforceable against plaintiffs under the circumstances of the case, including whether it was

significantly conspicuous.  Id. at 1269-70.  To address this inquiry, the court cited to comment c

of Section 496B of the Restatement (Second) of Torts, which states,

> In order for an express agreement assuming the risk to be effective, it must appear
> that the plaintiff has given his assent to the terms of the agreement. Particularly
> where the agreement is drawn by the defendant, and the plaintiff's conduct with
> respect to it is merely that of a recipient, it must appear that the terms were in fact
> brought home to him and understood by him, before it can be found that he has
> accepted them.

Id. at 1273-74 (quoting Restatement (Second) of Torts § 496B, cmt. c).  Applying these

9

principles to the facts before it, the Pennsylvania Supreme Court determined that because (a) neither plaintiff read the exculpatory language on the snow tubing ticket; (b) no Ski Shawnee employee verbally informed either plaintiff that they were entering into a contractual agreement, including the exculpatory language, by paying for accepting the ticket; and (c) neither plaintiff had previously gone snow tubing, the disclaimer was not "brought home" to plaintiffs or understood by them. Id. at 1274.

In response to Ski Shawnee's arguments that the disclaimer language on the ticket itself was so conspicuous that it alone would put a reasonable purchaser on notice, the court noted that it needed to consider three factors: "(1) the disclaimer's placement in the document, (2) the size of the disclaimer's print, and (3) whether the disclaimer was highlighted by being printed in all capital letters or in a type style or color different from the remainder of the document." Id. at 1274-75. An analysis of these factors revealed that the disclaimer language was in a barely readable font size, the references to "Ski Shawnee" and its logo were set forth in the largest text on the ticket, and the font size of the "PLEASE READ" language above the waiver was equivalent to the phrases on the bottom of the ticket, "NON-TRANSFERABLE" and "NON-REFUNDABLE." Id. at 1275. Accordingly, the court declined to find, as a matter of law, "that the disclaimer language on the ticket itself was sufficiently conspicuous such that, without any further indications from the ski facility, a purchaser would be put on notice of its contents." Id.

While instructive on the applicable standards, Beck-Hummel is distinguishable from the instant matter and, in fact, advocates a finding that the release at issue is enforceable. First, the Beck-Hummel court focused extensively on the fact that the release was simply printed on the snow tubing tickets handed to the plaintiffs. In doing so, it explicitly distinguished cases in

10

which the plaintiffs had actually signed the release, finding the fact of the signature dispositive. Id. at 1270.[6]  Indeed, the Court's emphasis that the terms of the release must be "brought home to" and "understood by" the plaintiff referred precisely to situations where the "plaintiff's conduct with respect to [the release] is merely that of a recipient." Id. at 1273-74 (citing Restatement (Second) Torts § 496b, cmt. c).  By contrast, in this case, Plaintiff was not merely a recipient of the disclaimer, but rather affirmatively placed his signature on the document directly below the release language.  Such actions, under the mandates of Beck-Hummel, clearly evidenced his intent to be bound by the language of the document.

Second, the Beck-Hummel court recognized that, even in cases where a plaintiff is a mere recipient of a release, the conspicuousness of a disclaimer may suggest that a waiver is enforceable. Id. at 1274.  "A term is considered conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Borden, Inc. v. Advent Ink Co., 701 A.2d 255, 259 (Pa. Super. Ct. 1997) (quoting 13 Pa. Cons. Stat. Ann. § 1201). Applying the three indicators of conspicuousness identified by the Beck-Hummel court, the release at issue was, in fact, written so that Plaintiff would have been put on notice.  It appeared as a separate page unto itself and stated, at the top of the document in bold and capital letters, "WARNING: YOU ENTER THIS SITE AT YOUR OWN RISK."  (Def. Mem. Supp. Summ. J.

---

[6]  Specifically, the court distinguished the following cases, all of which involved a signed release and all of which upheld the waiver:  Savarese v. Camelback Ski Corp., 417 F. Supp. 2d 663 (M.D. Pa. 2005); Mazza v. Ski Shawnee, Inc., 74 Pa. D & C.4th 416 (Pa. Com. Pl. 2005); Angle v. Hidden Valley Resort, L.P., No. 665 Civ.2000 (Pa. Com. Pl. Aug. 20, 2002); O'Neill v. Cove Haven, Inc., No. 3613 Civ.2000 (Phila. Cty. Common Pleas Nov. 32, 2001), aff'd, 803 A.2d 804 (Pa. Super. 2002) (table); Forbes v. Ski Roundtop Operating Corp., No.2001-SU-0043-01 (Pa. Com. Pl. July 24, 2001), aff'd, 804 A.2d 65 (Pa. Super. 2002) (table).  Beck-Hummel, 902 A.2d at1270-1273.

Ex. A.)  The remainder of the wording on the document, also in bold and capital letters, proceeded to detail the terms of the release and indicate that "[b]y signing below you give up all your and your heirs rights and claims to any and all injury or personal trauma or insult."  (Id.) Aside from the columns for signatures, there was no other wording on the document to detract a reader's eyes from the disclaimer language.  Accordingly, Plaintiff cannot argue that the release language was inconspicuous or somehow hidden from his attention.

Plaintiff's alternative argument – that the release cannot be enforced against him since he does not speak or read English – is also unavailing.  As noted above, the test for the enforceability of a release is an objective one, from the perspective of a reasonable individual. Borden, 701 A.2d at 259.  Well-established contract principles make clear that when a contract, as here, is not legally ambiguous, but rather clear and unequivocal, the court determines the meaning of the contract terms by looking only at the content of the contract without reference to the surrounding circumstances.  Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987).  "A person of age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument which he signed."  Schoble v. Schoble, 37 A.2d 408, 411-12 (Pa. 1944); see also Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1174-75 (E.D. Pa. 1990) ("Where there is no allegation and proof of fraud or where there is no legal justification for failure to read a written contract on which suit is brought, failure to read is an unavailing excuse or defense and cannot justify avoidance, modification or nullification of the contract or any provision thereof[.]") (quoting T.W. Phillips Gas and Oil Co.

v. Kline, 84 A.2d 301, 302 (1951)); Simeone v. Simeone, 581 A.2d 162, 165-166 (Pa. 1990)

("[C]ontracting parties are normally bound by their agreements, without regard to whether the

terms thereof were read and fully understood and irrespective of whether the agreements

embodied reasonable or good bargains.").  Applying Pennsylvania law, Courts have upheld

contract provisions or signed releases, even where the plaintiff has alleged an impediment to

fully reading or understanding the contract.  See, e.g., Nieves v. Hess Oil Virgin Islands Corp.,

819 F.2d 1237, 1253 (3d Cir. 1987) ("[N]otwithstanding plaintiff's illiteracy, he is bound to the

legal consequences of signing the form."); Gimpel v. Host Enters. Inc., 640 F. Supp. 972, 975

(E.D. Pa. 1986) (enforcing an exculpatory clause and rejecting plaintiff's argument that he could

not read the contract before he signed it because he did not have his reading glasses with him

when he arrived at the rental office), aff'd, 813 F.2d 397 (3d Cir. 1987); Commonwealth to Use

of Liberty Nat. Bank of Pittson v. Gudaitis, 186 A 82, 83 (Pa. 1936) (holding that mere illiteracy

is not grounds to avoid a written instrument); Appeal of Weller, 3 Pennyp. 545, 1883 WL 14034,

at *5 (Pa. 1883) (holding that no one is bound to sign an instrument that he does not understand;

if an individual signs it without asking to have it read or explained to him, he is bound by it, and,

without a showing of fraud, cannot escape the obligations imposed by it by pleading his illiteracy

or imperfect understanding of the English language); see also Duran v. Intex Aviation Svcs., Inc.,

98 F.3d 1339, 1996 WL 556967, at *5 (5th Cir. 1996) (finding, under Texas law, that plaintiff's

inability to "speak, read, or write English" and thus to "understand the meaning of the papers she

signed" did not preclude enforcement of a waiver clause).

     In this case, Plaintiff cannot claim ignorance to avoid the ramifications of his signed

release.  Although Plaintiff could not read the release himself, he could have either asked Pedro

Rosado, who read both English and Spanish, to translate the writing on the sheet or inquired as to

whether a Spanish-speaking employee of the junkyard was available to explain the document.

Nonetheless, he admitted that he exercised neither option.[7]  (Arce Dep. 49:7-20, 55:8-13.)

Rosado's misrepresentation that the release was nothing more than a sign-in sheet likewise does

not act to nullify the contractual relationship.  See Seaton v. East Windsor Speedway, Inc., 582

A.2d 1380, 1383 (Pa. Super Ct. 199) ("[A]releasor can ordinarily not avoid the effect of a release

upon the ground that at the time he signed the paper he did not read it or know its contents, but

relied on what another said about it." (quoting 66 Am. Jur.2d Release § 15 (1973))).  Nor did

Defendant have an obligation to verify that Plaintiff had read and fully understood the terms of

the document before he signed his name to it.  Schillachi, 751 F. Supp. at 1175 (imposing a duty

to inform effectively would abrogate Pennsylvania's legal duty to read).  As such, the Court

declines to find the release to constitute an unconscionable contract of adhesion.

**2.     Whether the Release Specified the Parties' Intentions with Particularity**

In his second challenge to the enforceability of the release, Plaintiff contends that the

provision, as written, was ambiguous.  To support this allegation, he argues that:  (1) the release

did not specify that Defendants were being released for their own acts of negligence; (2) even if it

had included negligence, it referred only to the time "during [the customer's] arrival onto the

property" and thus would not relate to defendants' negligence prior to or after customers had

arrived and were working on pulling parts from the vehicles.

---

[7]  Notably, both Plaintiff and his companion Jose Cintron testified that they understood the English word "warning," which was prominently placed as the first word on the release document.  (Arce Dep. 129:1-2, Cintron Dep. 25:23-26:13.)

14

As to the first argument, courts have previously considered and rejected the proposition that the word "negligence" must be contained within a release in order to exempt a defendant from his own negligence.  For example, in <u>Wilson v. Am. Honda Motor, Inc.</u>, 693 F. Supp. 228 (M.D. Pa. 1988), the plaintiff rented an ATV and hit a rock, causing it to plummet over an embankment.  <u>Id.</u> at 228.  Plaintiff sued defendant American Honda, the manufacturer of the vehicle, which, in turn, joined the rental company as third-party defendants.  <u>Id.</u>  The rental company invoked a release clause in the signed rental agreement which stated, "[t]he rental agent is not responsible for accidents or injuries caused directly or indirectly in the use of this rented item." <u>Id.</u> at 230.  Plaintiffs maintained that the release provision was ambiguous because it was unclear if the language was meant to exempt the rental agent from liability for its own negligence.  <u>Id.</u>  The court, however, found the language of the release provision "clear, conspicuous and sufficiently detailed and that the provision unequivocally releases the third-party defendants from liability for any negligence on their part in connection with the rental of the ATV." <u>Id.</u> at 231.  The court went on to note that "[i]t was not necessary for the third-party defendants to specify in the exculpatory provision that they intended to acquire immunity from liability for their own negligence." <u>Id.</u>; <u>see also</u> <u>Schiallachi</u>, 751 F. Supp. at 1173-74 (E.D. Pa. 1990) (holding that where signer to a release agrees to "hold harmless [the defendants] . . . from all liability, . . . from any . . . injury (including death) . . .," negligent conduct by the defendants is included in that language); <u>Zimmer v. Mitchell and Ness</u>, 385 A.2d 437, 439-40 (Pa. Super. Ct. 1978), <u>aff'd</u>, 416 A.2d 1010 (Pa. 1980) (holding that waiver which released defendants "from any liability for damage an injury to myself or any person or property resulting from the use of this equipment" included accidents resulting from defendants' negligent conduct).

15

The same holds true in this case.  The release provision at issue stated that by signing, the signer "give[s] up all [his] rights and claims to any and all injury or personal trauma or insult. [The signer] also understand[s] that there is no insurance or recourse available in the event of any occurrence [sic] or accident that happens during [the signer's] arrival on the property of U-Pull-It Auto Parts."  A commonsense reading of this provision suggests that it covers "any and all injury" in the event of "any occurrence or accident" on the premises.  To suggest that Defendants should have specified that they were seeking immunity from liability for their own negligence would demand "an overabundance of particularity," and "run[] the risk of causing confusion." Wilson, 693 F. Supp. at 231.

With respect to Plaintiff's second argument that the release does not relate to Defendants' negligence prior to or after customers had arrived and were working on pulling parts from the vehicles, the Court finds no merit.  To the extent Plaintiff argues that the release was not retrospective and could not relieve Defendants from negligence in maintaining the property prior to Plaintiff's execution of the release, numerous courts have rejected similar efforts to limit a release's temporal scope.  See, e.g., Zimmer, 385 A.2d at 440 (releasing ski rental shop from liability because any negligence in renting equipment to plaintiff without first testing and fitting ski bindings "occurred simultaneously with plaintiff's acceptance of the rental agreement and receipt"); Grbac v. Reading Fair Co, 521 F. Supp. 1351, 1356 (E.D. Pa. 1981) (releasing racetrack from liability for failing to install warning lights on the track because "any breach of a duty owed to the plaintiff occurred when the plaintiff and the defendants executed the contract"), aff'd, 688 F.2d 215 (3d Cir. 1982); Nicholson v. Mt. Airy Lodge, Inc., No. 97-CV-1296, 1997 WL 805185, at *3 (E.D. Pa. Dec. 29, 1997) (finding that "any negligence by defendant for failing

16

to maintain or inspect the roller skates occurred simultaneously with plaintiff's signing of the rental agreement and acceptance of the skates.").

To the extent Plaintiff claims that the release was inapplicable to events after a customer's actual "arrival" onto the property, the Court likewise finds no merit.  The release referenced accidents or occurences "during [the signer's] arrival on the property of U-Pull-It Auto Parts."  This provision, albeit not eloquently drafted, clearly meant to include incidents occurring while Plaintiff was on the property and working on cars.  Accepting Plaintiff's reading of this clause would effectively void the release and fall contrary to its plain language.

Although waivers of liability are not favored in the law, courts should not hesitate to enforce such a waiver where the intentions of the parties are spelled out with particularity and their agreement shows a clearly expressed purpose to release a party from liability.  <u>Valeo v. Pocono Intern. Raceway, Inc.</u>, 500 A.2d 492, 493 (Pa. Super. Ct. 1985).  In this case, the waiver was clear, conspicuous and clearly intend to release Defendant from liability for incidents occurring on the property.  Given such circumstances, the Court must enforce the release and grant summary judgment in favor of Defendants.

### B.    <u>Whether Defendants Had A Duty to Plaintiff</u>

In its alternative argument for summary judgment, Defendants contend that, even if Plaintiff's suit is not barred by the release, he has failed to prove a substantive case of negligence.  To prevail on a cause of action in negligence under Pennsylvania law, a plaintiff must establish: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting

17

to the interests of another.  Morena v. South Hills Health Sys., 462 A.2d 680, 684 n. 5 (Pa. 1983).

Defendants argue that Plaintiffs' case fails at step one as neither U-Pull-It nor Defendants Joseph

Mallozzi and Joseph A. Mallozzi (the "Mallozzi Defendants") had a duty as possessors of land[8]

to protect Plaintiff.

A possessor of land is one "who is in occupation of land with intent to control it."

Restatement (Second) of Torts, § 328E(a) (1965).  Under Pennsylvania law, the duty of a

possessor of land towards a person entering his land is measured by the status of the entrant at

the time of the accident.  Palange v. City of Phil. Law Dep't., 640 A.2d 1305, 1308 (Pa. Super.

_____

[8]  Defendants also argue that Plaintiff has alleged no basis for imposing any liability on the Mallozzi Defendants.  As noted above, Joseph Mallozzi is the sole shareholder and president of the corporation, while his father, Joseph A. Mallozzi, is the secretary and treasurer of the corporation.  (Mallozzi Dep. 27-30, 30:19-31:4). The general rule in Pennsylvania is that a corporation shall be regarded as an independent entity even if, as here, its stock is owned entirely by one person.  College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 207 (Pa. 1976).  Factors which may justify disregarding the corporate form include undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud.  Kaites v. Commwealth of Pa., Dept. of Environ. Res., 529 A.2d 1148, 1151 (Pa. Commw. 1987).  Plaintiff, in this case, however, cites to no evidence or facts to support disregarding U-Pull-It's corporate form.  Thus, the Court cannot impose any shareholder liability on the Mallozzi Defendants.
The inquiry, however, does not end at this juncture since the Mallozzi Defendants also served as corporate officers of U-Pull-It.  As a general rule, corporate officers are individually liable for their own tortious actions.  Wicks v. Milzoco Builders, Inc., 490 A.2d 86, 89-90 (Pa. 1983).  In Pennsylvania, the "participation theory" imposes liability "on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity."  Id.; see also Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978); Mill Run Assocs. v. Locke Prop. Co., Inc., 282 F. Supp. 2d 278, 287-88 (E.D. Pa. 2003).
In this case, Plaintiff has specifically alleged that the Mallozzi defendants were individually responsible for creating dangerous and defective conditions on the land and failing to prevent foreseeable harm from coming to their customer.  Given such allegations, the Court must analyze whether or not they had a duty, as possessors of land, to protect Plaintiff from such dangerous conditions.

Ct. 1994).  The Restatement (Second) of Torts § 343 dictates that a possessor of land must exercise reasonable care to protect invitees from non-obvious dangerous conditions on the land, as follows:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965); see also Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983) (adopting Restatement (Second) of Torts § 343).  The land possessor's duty extends to independent contractors as business invitees.[9] Rolick v. Collins Pine Co. 975 F.2d 1009, 1011 (3d Cir. 1992).

As set forth in the Restatement, "[f]or the duty to attach, the condition must be non-obvious.  In addition, there is no duty if the [business invitee] is in the same position as the landowner to discover the dangerous condition or if the [business invitee] is the party that created the dangerous condition in the first place."  Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 465-66 (E.D. Pa. 2007).  A danger is deemed to be "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the

---

[9] A business invitee is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) Torts § 332 (1965); Eikey v. Emerald Coal Resources, L.P., No. 06-CV-121, 2006 WL 3524452, *2 (W.D. Pa. Dec. 6, 2006).

visitor, exercising normal perception, intelligence, and judgment."  Restatement (Second) of

Torts § 343A, cmt. b.  For a danger to be "known," it must "not only be known to exist, but it

must also be recognized that it is dangerous and the probability and gravity of the threatened

harm must be appreciated."  Id.   Examples of obvious hazards are clearly visible patches of ice,

Carrender, 469 A.2d at 186, uneven steps, Villano v. § Sav. Assoc., 407 A.2d 440, 441 (Pa.

Super. Ct. 1979), the possibility of being hit by a wayward baseball while in the stands at a

baseball game, Jones v. Three Rivers Mgmt. Corp., 394 A.2d 546, 550-51 (Pa. 1978), and being

hit by an elevator by tilting one's head into an elevator shaft.  Malinder v. Jenkins Elevator Co.,

538 A.2d 509, 515-16 (Pa. Super. Ct. 1988).  This inquiry is an objective one, looking from the

perspective of a reasonable person.  Restatement (Second) of Torts, § 343A, cmt. b.

        Beyond the objective defense of a known and obvious risk, a defendant in a negligence

action is relieved of his duty to protect the plaintiff when the plaintiff was subjectively aware of

the risk and faced it voluntarily.  Kirschbaum v. WRGSB Assoc., 243 F.3d 145, 156 (3d Cir.

2001); Kaplan v. Exxon, 126 F.3d 221, 225 (3d. Cir. 1997).  Under current Pennsylvania law, as

interpreted by the Third Circuit, the assumption of risk analysis is incorporated into the duty

analysis.  See Massey v. U.S. Airways, Inc., No. 01-CV-346, 2001 WL 1135305, at *3 (E.D. Pa.

Aug. 30, 2001) (citing Kaplan, 126 F.3d at 225); see also Ernst v. Barr, 90 Fed. Appx. 670, 672

(3d Cir. 2004) (affirming Kaplan's holding that assumption of risk is part of the duty analysis).

Plaintiff has the burden of establishing that defendant had a duty; the defendant need not prove

plaintiff assumed the risk of his injury.  Kaplan, 126 F.3d at 225.  In other words, "[w]hen an

invitee enters business premises, discovers dangerous conditions which are both obvious and

avoidable, and nevertheless proceeds voluntarily to encounter them, the doctrine of assumption

of risk operates merely as a counterpart to the possessor's lack of duty to protect the invitee from

those risks." Carrender, 469 A.2d at 125.   "Thus, to say that the invitee assumed the risk of

injury from a known and avoidable danger is simply another way of expressing the lack of any

duty on the part of the possessor to protect the invitee against such dangers." Id.

"In order, however, to assume the risk, the plaintiff must have knowledge or awareness of

the risk or hazard." Rice v. Skytop Lodge Corp., No. 00-CV-2243, 2002 WL 775484, at *3

(M.D. Pa. Apr. 23, 2002).   Additionally, "[a] plaintiff voluntarily confronts a danger only where

there is a real choice involved, that is, where a safe alternative exists to encountering the risk."

Ernst, 90 Fed. Appx. at 672 (internal quotation marks omitted).   "In the context of a summary

judgment motion, unless 'reasonable minds could not disagree that the plaintiff deliberately and

with the awareness of specific risks inherent in the activity nonetheless engaged in the activity

that produced his injury,' the decision as to whether a defendant bore a duty to a plaintiff and

whether a plaintiff exposed himself to risk such that a defendant would be relieved of any such

duty is a matter for the jury to decide." Mascharka v. Leola Family Rest., Inc., No. 03-CV-4051,

2004 WL 2980410, at *4 (E.D. Pa. Dec. 23, 2004) (quoting Howell v. Clyde, 620 A.2d 1107,

1112-13 (Pa. 1993)).

Without opining on the objective obviousness of the danger that Plaintiff encountered,

this Court finds that reasonable minds could not differ as to Plaintiff's knowing and voluntary

assumption of the risk which resulted in his injury.   First, Plaintiff testified that he had extensive

experience working on cars and was not simply a layman with respect to automotive repair.   He

worked nine months in an automotive shop as a full mechanic, including pulling out and

installing transmissions.   (Id. at 14:14-16:13.)   In addition, he had vocational training in auto

21

mechanics for one year, regularly worked on friends and family's cars and had removed

transmissions at junkyards on three or four previous occasions.  (Id. at 25:3-26:9, 43:16-44:11.)

Second, Plaintiff conceded that he fully understood the dangers of working under a

jacked-up car that was not secured either by jack stands or other means:

> Q.    When you use the jacks, the hydraulic jacks, and you lift a car, do you
>       work underneath the car before you place the jack stands?
>
> A.    No.
>
> Q.    Why?
>
> A.    For safety.
>
> Q.    So after you raise the car with the jack then you place the jack stands?
>
> A.    Exactly.
>
> Q.    Why do the jack stands make it safe?
>
> A.    Well, because when you are working on a stable surface which is safe I
>       mean I've seen accidents even working under good conditions where a car
>       will just come down upon somebody that's working underneath it and get
>       killed immediately.
>
> Q.    When did you learn to use jack stands?
>
> A.    At the vocational school shop?
>
> Q.    They taught you in school?
>
> A.    Yes.  I mean, if we – if we didn't use the jack stands after using the jacks
>       to pull up the cars, I mean we just couldn't work under – under it because
>       it was unsafe.

(Id. at 40:22-41:19.)

> A.    Really the only thing that, you know, that I failed, that I failed to do, as I
>       had mentioned earlier, was not following the instructions by my teacher.
>
> Q.    Which instructions?
>
> A.    Of not having – not having the jack stands and not having secured the car
>       in order to get underneath it to work on it.
>
> Q.    How could you have secured the car if you didn't have your jack stands?
>
> A.    I definitely could have secured it if the finger lift operator had brought the

22

car up and we had a few tires to put in the corners of each car in order to secure it and stabilize it and that way the car would not be wobbly at all.

Q.     Did you see any tires around the yard?

A.     Yes.


Q.     Lots of them?

A.     There were quite a few?

(Id. at 60:16-61:10.)


Q.     Did you make a mistake that day getting under the car?

A.     I mean, I can consent to the fact that that may have been a mistake, but it's my job and I got to support my family . . .

(Id. at 89:5-9.)


Q.     Have you ever seen a car fall off a jack before this date?

A.     Yes.

Q.     How many times?

A.     I have witnessed three accidents.

Q.     Three accidents involving cars falling off of jacks?

A.     Yes, and one of them killed a person.

Q.     Was that before your accident?

A.     Long before my accident.

(Id. at 90:22-91:7.)


Finally, Plaintiff acknowledged that he had other, safer alternatives that he failed to utilize, despite his knowledge of the existing dangers:


Q.     Did you try to put any tires and wheels underneath this car?

A.     No, not necessarily, because in order to be able to slip the tires underneath it, each tire is about four to five inches high when it's lying flat, so in order

23

to be able to reach that kind of height I needed a bigger jack and the jacks I had didn't go that high.

\* \* \*

Q.    Did you talk to Pedro and Jose about going back to Marshall Street to get your floor jacks?

A.    We didn't talk to them about it because supposedly Pedro left to go and pick up his kids and also the thing was the distance.  It's pretty far away from the junkyard to where we live.

\* \* \*

A.    If it – if it had been up to me to go – to go back and get the jacks, yes, I would have done it.  I mean, it doesn't matter to me.  The distance, you know, didn't matter.

Q.    Why wasn't it up to you?

A.    Well, because really I'm there as an employee.  I wasn't there to – I mean, it wasn't up to me.  I wasn't driving my car.

Q.    You were an employee of who?

A.    Of Jose Cintron.  He was the one that needed the transmission.


(Id. at 70:23-71:14.)


Q.    Was the car raised up enough so that you could have had one tire on each side?

A.    Yes.

Q,    Why didn't you place one tire on each side?

A.    The thing is that if I had placed two tires underneath it, one on each side, you know, the space that I had left for me to work with wouldn't have been enough. . . . if I had put two tires underneath it then the car would have been slanted a lot higher . . .

Q.    Why not use a tire on each side as a safety while it's sitting on the scissor jacks.

A.    Well, the actuality is that the discomfort of the place.

Q.    What do you mean?

A.    I don't know if you have, but the junkyard, there was a car to the side and one on the other side, then there is one in front and one behind, and the only considerable space that I had was right in front of the – of the car and I think that amounted to about four to five feet.  So really on the left side

24

> of the car you basically had to put a tire, you know, upright and then slowly perhaps struggle to slip it underneath the car because there wasn't enough space.

Q.   Did you try?

A.   No I didn't try.  You know, I mean the reality of it is I was thinking at that time that it was going to be real hard to and difficult and if I had known that this was going to happen to me I wouldn't have left the house that day.

(Id. at 86:8-87:21.)

Q.   Was it possible to pay more to have U-Pull-It take the transmission out?

A.   Yes.

Q.   For how much?

A.   I don't know because I didn't have that information, but – but Jose was willing to pay, you know, to have somebody pull it out.

Q.   If he was willing to pay to have somebody pull – to pull it out why did you do it yourself?

A.   Well, it's as I was telling you earlier, I mean I came here to work and to work, to be paid with my work in order to be able to – to support my daughter and forge ahead my own life.

Q.   So you're saying you would have made more money on the transmission job if you removed it yourself than if the yard removed it?

A.   That's precisely it. . . .

(Id. at 94:23-95:15.)

Given these admissions, the Court concludes that no genuine issue of material fact exists as to whether Plaintiff assumed the risk of injury on the day of the accident.  As noted above, he had training in automotive repair, fully understood that working on a car propped up only on jacks was dangerous, had witnessed cars falling off jacks and injuring people on three prior occasions and, despite the availability of safer alternatives, chose to work on the car that day as it stood unsecured.  No question exists as to whether Plaintiff understood the character and

magnitude of the risk he was undertaking.  Indeed, he expressly conceded that he made a mistake

and, in hindsight, would not have done what he did.

Plaintiff's current efforts to create a genuine issue of material fact are unavailing.  By way

of an "expert report," Plaintiff has alleged that Defendants were negligent in failing to provide its

customers with guidance or assistance in lifting and supporting a vehicle and failing to warn its

customers of the danger associated with working under a lifted vehicle, both of which were

causative factors in the subject accident.  (Pl Mem. Ex. E.)  Such allegations, however,  disregard

the fact that no duty to exercise any such reasonable care ever arose.[10]  The same holds true for

Plaintiff's reliance on the alleged instruction given by Manual Rosado that the Plaintiff should

use jacks found around the junkyard.[11]  While such advice may have been a basis for negligence

---

[10]  Defendants also argue, and this Court agrees, that Plaintiff's expert, George
Meinschein, P.E., does not clearly satisfy the standards set forth in <u>Daubert v. Merrell Dow
Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993).  Specifically, his theories neither
require any specialized knowledge greater than that possessed by the average layman nor are
based on any reliable methods of review.  <u>See id.</u> 509 U.S. at 589, 113 S. Ct. at 2795 (district
courts act as gatekeepers to "ensure that any and all scientific testimony or evidence is not only
relevant, but reliable.").

[11]  Notably, Manual Rosado denied ever telling Pedro Rosado to use jacks found around
the junkyard.  (Rosado Dep. 14:13-15:4.)  To contradict this statement, Plaintiff did not submit
Pedro Rosado's deposition or affidavit, but instead relied on the depositions of both Plaintiff and
Cintron, who testified that Pedro told them that Manual said they should just use the jacks in the
junkyard.  (Arce Dep. 74:22-75:1, Cintron Dep. 15:2-8.)  Such a statement is obvious hearsay.
"It is clear that when considering a motion for summary judgment, a court may only consider
evidence which is admissible at trial, and that a party can not rely on hearsay evidence when
opposing a motion for summary judgment."  <u>Bouriez v. Carnegie Mellon University</u>, No. 02-CV-
2104, 2005 WL 2106582, at *9 (W.D. Pa. Aug. 26, 2005) (internal citations and quotations
omitted).  While, "[h]earsay evidence produced in an affidavit opposing summary judgment may
be considered if the out-of-court declarant could later present that evidence through direct
testimony, . . . the mere possibility that hearsay statement will be presented in form of admissible
evidence at trial does not warrant consideration of hearsay evidence at summary judgment stage."
<u>Id.</u>  "[A] party must respond to a hearsay objection by demonstrating that the material would be
admissible at trial under an exception to hearsay rule, or that the material is not hearsay."  <u>Id.</u>

if a duty existed, the fact remains that any duty was obviated by Plaintiff's knowing and voluntary assumption of risk.  Accordingly, no genuine issue of material fact exists as to whether Defendants were negligent as possessors of land.

**IV.     CONCLUSION**

Although Plaintiff undoubtedly suffered severe injury as a result of the events at issue in this case, he has failed to establish a viable claim of negligence against Defendants  Aside from the fact that Plaintiff signed an enforceable release of his rights, he has failed to prove that Defendants had any duty as possessors of land to protect him from risks which he knowingly and voluntarily assumed.  As such, we grant summary judgment in favor of Defendants on the entirety of the Amended Complaint.

---

In this case, the Court has already ruled, on October 3, 2007, that, due to Plaintiff's failure to provide an address for Pedro Rosado to Defendants so that he may be deposed, Rosado's testimony would be excluded at trial.  Given Plaintiff's inability to present Rosado's statement in admissible form at trial and in light of the absence of any non-hearsay evidence contradicting Manual Rosado's statement, the Court cannot find that any genuine issue of material fact exists on this point.

27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ANGEL ARCE,                              :
                                         :          CIVIL ACTION
       Plaintiff,                    :
                                         :
    v.                                   :
                                         :
U-PULL-IT AUTO PARTS, INC.               :          NO.  06-5593
t/a CRESENT "U-PULL-IT" USED             :
AUTO PARTS, JOSEPH MALLOZZI              :
and JOSEPH A. MALLOZZI                   :

## ORDER

AND NOW, this *11th* day of *February* 2008, upon consideration of the Motion of

Defendants U-Pull-It Auto Parts, Inc., Joseph Mallozzi and Joseph A. Mallozzi (Docket No. 33),

Plaintiff's Response (Docket No. 51) and Defendants' Reply Brief (Docket No. 52), it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED.**

     **JUDGMENT IS ENTERED** in favor of all Defendants and against Plaintiff.  This case

is closed.

                 BY THE COURT:



                 ***s/ Ronald L. Buckwalter, S. J.***
                 RONALD L. BUCKWALTER, S.J.